IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

MELINDA LANCASTER,           )
                             )
        Plaintiff,           )
                             )
v.                           )    Case No. 1:07-cv-0044
                             )
MICHAEL J. ASTRUE,           )    Judge Thomas A. Wiseman, Jr.
COMMISSIONER OF SOCIAL SECURITY, )
                             )
        Defendant.           )

MEMORANDUM OPINION

Before the Court is Plaintiff Melinda Lancaster's Motion for Judgment on the Administrative Record (Doc. No. 17) and supporting memorandum (Doc. No. 21) seeking judicial review of the Commissioner's denial of her claim for Social Security Disability Insurance Benefits ("DIB"). The prior referral of this case to the Magistrate Judge is withdrawn and the Court finds, for the reasons explained below, that the ALJ's underlying decision is supported by substantial evidence in the record and that the ALJ applied the correct legal principles in reaching his decision. Plaintiff's Motion for Judgment on the Administrative Record will therefore be denied and the Commissioner's decision affirmed.

I.      BACKGROUND

        A.      Procedural history

Plaintiff filed a claim for Disability Insurance Benefits ("DIB") under Title II of the Act on October 30, 2001. She originally identified her alleged disability onset date ("DOD") as August 27, 1996, and most of the allegations in her application for DIB focus on her medical condition and events that occurred after that date. A Field Office Disability Report completed by a Social Security Administration representative on May 1, 2002, presumes a DOD of August 1, 1989, although the representative, as Plaintiff frames it, "recommended" an alleged DOD of September 1, 1993. The date of the onset of disability is important because it is undisputed that Plaintiff's date last insured ("DLI") for purposes of DIB is September 30, 1993. In other words, Plaintiff's insurability for Title II purposes expired on September 30, 1993, so she must prove her disability began prior to that date in order to qualify for DIB. *See* 20 C.F.R. § 404.101(a); *Henley v. Comm'r of Soc. Sec.*, 58 F.3d 210, 213 n.4 (6th Cir. 1995) ("Insurability is a prerequisite to

receipt of disability benefits but not to receipt of SSI benefits.").

In a notice dated August 15, 2002, Plaintiff was informed that her disability claim had been denied; her claim was denied again upon reconsideration. (AR 26–27, 28–29.) Upon Plaintiff's request, a hearing was held on February 23, 2005 before Administrative Law Judge ("ALJ") Mack H. Cherry, who issued his decision denying Plaintiff's claim on October 3, 2005. (AR 11–19.) Plaintiff's request for review by the Appeals Council was denied on April 18, 2007 (AR 6–8), which rendered the ALJ's decision the final determination by the Commissioner that Plaintiff was not disabled for any period of time prior to September 30, 1993. Plaintiff filed this action seeking review of that decision pursuant to 42 U.S.C. § 405(g).

### B.    Plaintiff's Medical History

Plaintiff was born in 1963 and was twenty-six years old on her alleged onset date of August 27, 1989. She was thirty years old on September 30, 1993, and forty-one years old at the time of the hearing in 2005. In other words, she has at all relevant times been classified as a "younger individual" for Social Security purposes. 20 C.F.R. § 404.1563. She has a bachelor's degree in psychology from Madonna University in Livonia, Michigan, and later become licensed in Michigan to be a minister with the Church of God. While attending school, she worked full time as a secretary. She worked as a secretary for a shoe company from September 1982 through September 1985, and again from July 1988 until March 1989. She worked as a teacher's aide and then a teacher from September 1985 through June 1988. She worked as a secretary in a law office from May through August 1989, when she stopped work voluntarily to "start a family." (AR 69–70.) She gave birth to her son in February 1990. (AR 719.)

Her medical history prior to 1989 was remarkable insofar as she was in a motor vehicle accident in March 1987 in which she fractured some ribs and suffered a "severe cervical spine sprain." (AR 1987– 88.) She complained again of low-back pain to her treating physician, Dr. Ashwin Shah, in October 1987. (AR 1992.)

In September 1988 she fractured her left foot. Several days later, the swelling in her foot was so severe that she was admitted to Oakwood Hospital in Dearborn, Michigan for left deep vein thrombophlebitis. The swelling was such that a venogram, though ordered, could not be performed. (AR 684–96.)

In December 1988 she began complaining of pelvic pain and a feeling of fullness. Dr. Shah suspected an ovarian cyst, but an ultrasound performed a few days later was essentially normal. She was still complaining of some pelvic discomfort in January 1989. (AR 1993, 1999.)

Dr. Shah first noted an impression of early pregnancy in July 1989 (AR 1994), just before Plaintiff quit her job as a secretary to "start a family." (AR 69.) She gave birth on February 17, 1990 after "an uncomplicated prenatal course." (AR 719.)

It is clear that Plaintiff's mental and physical health took a turn for the worse after she gave birth to her son. In July 1990, Plaintiff's child's pediatrician, Dr. Veena Dua,[1] noted that Plaintiff was "not feeling well" and had been "very depressed since birth of baby boy." (AR 755.) Dr. Dua diagnosed post-partum depression and prescribed Elavil and Halcion, and instructed her to return in three days. Upon her return three days later, Plaintiff reported feeling somewhat better though she was still very depressed. Dr. Dua continued to tinker with Plaintiff's medications over the next month, during which time Plaintiff continued to suffer from depression, though her condition improved. Dr. Dua wanted to refer her to a psychiatrist, but Plaintiff refused to see a psychiatrist.[2] (AR 756.) Dr. Dua continued to prescribe anti-depressants and to advise her to see a psychiatrist. By mid-August, Plaintiff reported "mentally feeling much better." (*Id.*) In September, Plaintiff again reported feeling "much better." (AR 753.)

Dr. Dua's treatment notes for the next few months indicate Plaintiff's depression remitted, but by December, Plaintiff reported "back ache, abdominal pain and just not feeling well." (AR 753.) Also at that time, Dr. Dua noted that Plaintiff weighed 104 pounds and was "unable to gain weight." (AR 754.) This is the first note in Plaintiff's file documenting any concern about her weight.

Later in December 1990, Plaintiff began seeing gynecologist Dr. Suruli with complaints of right lower-quadrant abdominal pain. An ultrasound was normal, however. (AR 2080.) In February 1991, Plaintiff was still complaining of abdominal pain and underwent a diagnostic D&C and diagnostic

---

[1] Plaintiff testified at the hearing that Dr. Dua, who was a family practitioner, "picked up on" Plaintiff's depression and began treating her as well. (AR 2101.)

[2] Plaintiff testified at the hearing that her religious beliefs paid a substantial part in her refusal to see a psychiatrist. She also testified that, because her undergraduate degree was in psychology, she felt she could "handle it [her]self." (AR 2101.)

laproscopy.  Her post-operative diagnosis was "[m]ild chronic bilateral salpingitis[3] causing chronic pelvic pain; [m]etrorrhagia and dysmenorrhea."  (AR 714.)

On March 13, 1991, Plaintiff had a lumbar spine x-ray to investigate a complaint of lumbar radiculopathy.  The x-ray revealed a "barely perceptible" spondylolisthesis at L5-S1.  (AR 796.)  On April 10, 1991, Plaintiff underwent a lumbar myelogram and post-myelogram CT scan for further evaluation of her complaints of low-back pain and pain radiating down her right leg.  The examination notes for that day indicate that Plaintiff reported she had been experiencing lower back pain radiating down her right lower leg for the past fourteen months, since giving birth, with the pain increasing over that time period.  The lumbar myelogram and post-myelogram CT scan revealed no significant abnormalities.  (AR 704–05.)

Plaintiff returned to Dr. Shah again later in April.  At that time she continued to complain about low back pain radiating down her right leg.  Dr. Shah prescribed Parafon Forte for pain.  Further, according to Dr. Shah's treatment records, Plaintiff's most recent visit with him, prior to April 26, 1991, had been on July 10, 1989 at which point Plaintiff was in "early pregnancy" and weighed 119 pounds.  On April 26, Plaintiff weighed 101 pounds.  Dr. Shah noted:  "weight loss etiology?"  (AR 1994.)

A few days later, Plaintiff was evaluated by Dr. Joe Weiss for the same complaint of radiating back pain, which Plaintiff again reported to have begun in March 1990 after the birth of her son.[4]  Dr. Weiss noted upon examination that Plaintiff demonstrated "significant loss of lumbar mobility with associated hip flexion contracture."  (AR 2016.)  Dr. Weiss also noted that Plaintiff reported deterioration in her condition after September 1, 1990 and that she claimed that resting decreased her pain level while prolonged sitting and standing increased it.  She did not carry her child "unless forced to go up and down stairs with him."  (AR 1982–83.)  Her husband was reportedly coming home from work every day at 2:30 and taking care of their child.  Dr. Weiss further recorded Plaintiff's report of a twenty-pound weight loss "which she [could] not explain."  (AR 1982.)  Dr. Weiss felt that if Dr. Shah's "current diagnostic workup" was unsuccessful over the next few weeks, he would "strongly recommend" that Plaintiff be referred "for further diagnostic evaluation to rule out metabolic causes for her complaints."  (AR 1983.)  Dr. Weiss

---

[3] Salpingitis is inflammation of the fallopian tubes.

[4] At the ALJ hearing, Plaintiff testified that Dr. Shah had referred her to a neurologist, Dr. Rotter, whose records she was unable to procure.  The record contains correspondence from Dr. Weiss to Dr. Rotter thanking him for referring Plaintiff to him.  (AR 1982–83.)

prescribed a course of physical therapy.

Plaintiff thereafter had nineteen visits with physical therapist Mark Mijnsbergen from May 10, 1991 through July 1, 1991. (AR 2017–22.) Mijnsbergen noted the initial goals of physical therapy to be (1) a seventy-five percent reduction in pain; (2) improved range of motion in the lumbar spine to the normal level; and (3) reduction of hypertonicity in the right gluteal insertion. (AR 2017.) In a letter to Dr. Shah dated June 24, 1991 requesting an extension of the original physical therapy prescription in order to continue treatment, Mijnsbergen described the course of treatment Plaintiff was following and noted that her pain had decreased by thirty percent at that point and that her posture had improved considerably. (AR 2012.) Dr. Shah complied by ordering four more weeks of therapy. (AR 2011.) Plaintiff only continued for another week, however, through July 1, 1991. In his discharge summary dated July 1, 1991, Mijnsbergen reported that Plaintiff continued to have low back pain but her posture had improved significantly; her range of motion in the lumbar region was normal, and there was no longer any abnormal muscle tone. He also noted, however, that she continued to have "multiple abdominal complaints which could reflect [sic] pain in the low back." (AR 2022.) In the "comment" section of the summary, he added: "Since there are no objective findings that could be treated with physical therapy at this point, we agreed to discontinue the treatments until more details are known about the abdominal problems," but that Plaintiff would "continue an exercise program at home." (*Id.*)

In the same time frame, Plaintiff continued to complain to Dr. Shah about abdominal pain. An upper abdominal ultrasound performed on May 9, 1991 was "[e]ssentially unremarkable." (AR 2009.) The last treatment note in Dr. Shah's records for Plaintiff is dated June 3, 1991, at which time Plaintiff's weight was recorded as 104 pounds, a gain of three pounds. Dr. Shah also noted that Plaintiff "still ha[d] stomach discomfort" of unknown etiology. (AR 1994.) He ordered additional radiographic studies, which were conducted on June 6, 1991. The results revealed "no abnormalities" and "[n]o functional or organic changes." (AR 2010.)

Plaintiff's medical record is a complete blank from July 1, 1991 until October 6, 1994, more than three years later, and more than a year after her September 30, 1993 DLI. The next treatment note in the record, after Mijnsbergen's discharge summary dated July 1, 1991, pertaining to Plaintiff's physical complaints is a radiology report dated November 14, 1994, documenting that Plaintiff had undergone a

radiographic examination of her upper gastrointestinal tract and small bowel, which was unremarkable. (AR 1233.)

On November 21, 1994, Plaintiff began treatment with psychiatrist David A. Burns, M.D. On that day, based upon Plaintiff's report of her mental-health history, Dr. Burns noted that Plaintiff's "losses" over the preceding four years included post-partum depression following the birth of her then four-year-old son; her son's being treated for a bowel obstruction at age one; and the deaths of both her mother-in-law and father-in-law. (AR 1728.) Plaintiff reported that her post-partum depression cleared after six months when she "went on sleeping pills and started feeling like a person again." (*Id.*) However, six months prior to her first treatment with Dr. Burns, she "woke up depressed. Something physically changed." (*Id.*) She attempted treatment through a Dr. Nagy around that time (whose records Plaintiff has been unable to obtain). Dr. Nagy apparently prescribed Paxil, which made her more nervous, and then Buspar and low-dose Ativan, which had helped somewhat until three weeks before Plaintiff's first appointment with Dr. Burns, when she woke up "very nervous." (*Id.*) She also reported suffering panic attacks, abdominal distress leading to a thirty-pound weight loss, smells making her feel ill as with pregnancy, decreased enjoyment of all things, sleep disturbance, racing thoughts, increased social isolation and "stomach problems and fever of unknown origin." (AR 1728–29.) Plaintiff continued to seek psychiatric treatment with Dr. Burns over the course of the next ten years, through at least October 2004. (AR 1690–1727.)[5]

In fact, the bulk of the very extensive medical records before this Court detail Plaintiff's psychological problems from 1994 going forward and her physical problems from 1996 forward. The Court will not detail the contents of those records other than to note that Plaintiff was ultimately diagnosed with reflex sympathetic dystrophy ("RSD") and Complex Regional Pain Syndrome Type I. Plaintiff submits, and the Court does not disagree for purposes of the present motion, that the record clearly supports a conclusion that Plaintiff has been disabled since 1996 at the latest. At the hearing, the ALJ commented that the medical exhibits covering the time period from 1996 forward were "very, very compelling," and that a confirmed diagnosis of RSD will generally result in a conclusion that a Social Security claimant is disabled. (AR 2125.) Because the claim before this Court only involves the question of whether Plaintiff is entitled to DIB, her eligibility for which expired as of September 30, 1993, the Court

_____

[5] A "To Whom It May Concern" letter from Dr. Burns submitted in support of Plaintiff's disability claim, dated February 21, 2005, suggests Plaintiff was still a current patient at that time. (AR 1936.)

has no need to examine closely Plaintiff's deteriorating medical condition from 1994 forward, nor to make an express finding with regard to whether Plaintiff was disabled as of 1994 or 1996.

None of Plaintiff's treating physicians actually attempted a retroactive diagnosis, nor did any of her treating physicians opine at any time that Plaintiff was disabled for Social Security purposes—that is, unable to work—prior to the September 30, 1993 DLI. In response to Plaintiff's request that he provide information about her condition that she could submit to the Social Security Administration in support of her disability claim, Dr. Burns prepared a "To Whom It May Concern" letter dated February 21, 2005 and completed a Mental Disorders Questionnaire dated February 20, 2005. In his letter, Dr. Burns opined that Plaintiff was disabled by her psychiatric condition from the time he first began treating her in November 1994, but he did not express an opinion about her condition prior to September 30, 1993. (AR 1936–37.) In the Mental Disorders Questionnaire, Dr. Burns responded to questions about the conditions and symptoms from which Plaintiff was suffering "on or before 9/30/1994." (AR 1938.) The selection of that date was apparently based upon Plaintiff's counsel's mistaken belief at the time that Plaintiff's DLI was September 30, 1994—rather than 1993. (AR 2096, 2145.) In any event, Dr. Burns indicated that Plaintiff had suffered severe psychiatric symptoms from "on or before 9/30/1994," including "[d]epressive syndrome" characterized by, among other problems, appetite disturbance and weight loss, sleep disturbance, and psychomotor agitation; "[g]eneralized persistent anxiety accompanied by" a number of physical signs and symptoms; "[r]ecurrent severe panic attacks"; and "[r]ecurrent obsessions or compulsions which are a source of marked distress." (AR 1938.) Dr. Burns found that these conditions had, since "on or before 9/39/1994," imposed marked restrictions in the activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, and repeated episodes of decompensation. (AR 1938–39.) He also noted that Plaintiff's "ability to persist over the past ten years has been dependent on [her] husband's emotional and physical help. She would not be able to do nearly as well without his assistance." (AR 1939.) Dr. Burns indicated, however, that he was unable to assess Plaintiff's ability to perform work-related activities "on or before 9/30/94," in such arenas as "Making Occupational Adjustment[s]," "Making Performance Adjustments," and "Making Personal Social Adjustments." (AR 1940.)

### C.    Plaintiff's Testimony at the ALJ Hearing

At the hearing before ALJ Mack Cherry on February 23, 2005, Plaintiff was called upon to discuss, among other matters, the gap in her medical records from 1991 through late 1994.  Plaintiff testified that her family situation made it difficult for her to continue to seek treatment for her own problems between 1991 and 1993.  (*See* AR 2104 ("I just kinda' lost track of, of my own health situation[.]").)  In February 1991, her one-year-old son "almost died of a bowel obstruction" and her father-in-law was diagnosed with a recurrence of cancer.  In June of 1991, her mother-in-law died suddenly and her sixteen-year-old sister disappeared.  Her father-in-law came to stay with her and her husband in December 1991 and stayed with them, bed-ridden, until he died in May 1992.  (AR 2105, 2127.)  Plaintiff indicated that her family received a significant amount of support from their church and other family members, as well as Hospice, such that her responsibilities were limited to keeping him company and occasionally bringing him meals.  (AR 2105.)

Plaintiff was asked whether she sought treatment from any physicians between May 1992 and November 1993.  She responded that Dr. Shah was the only physician she would have seen.  Dr. Shah's records indicate, however, that Plaintiff did not seek treatment from him after June 3, 1991.  In that regard, Plaintiff testified that Dr. Shah "just . . . came to the conclusion that we didn't know what the pain was from.  So you're just going to have to live with it.  So that's, basically, what I tried to do was just live with it."  (AR 2106.)

In November 1993, Plaintiff and her husband and child moved from Michigan to Tennessee when Plaintiff's husband went to work for Saturn Corporation.  Plaintiff described her psychological reaction to moving to Tennessee as "horrible" (AR 2107), and it is clear from her testimony and that of her husband that Plaintiff's physical and mental condition began to deteriorate significantly after the move, which occurred nearly two months after the expiration of Plaintiff's insured status.  At some point after moving, Plaintiff sought treatment from a Dr. Nagy, a Dr. Robinson, and a Dr. Halford, but Plaintiff's counsel's efforts to obtain medical records from those physicians were unsuccessful.

Plaintiff was also questioned regarding her physical condition from 1994 through 1996.  Plaintiff testified that she did not see any doctors other than Dr. Burns in that time frame.  (AR 1210–11.)  The

abdominal or back pain was "still there," but she had been told she would have to live with it, so that was what she did. (AR 2111.) She was asked how her low-back and leg pain affected her daily activities from November 1993 until she sought treatment again for the problem in 1996. She responded that her activities were generally limited to "do[ing] things" around the house "for a couple of hours," but that some days she was in so much pain she was unable to do anything at all. (AR 2111–12.) She also testified she was allergic to most pain medications. (AR 2111.)

> **D.** **The Testimony of Gregory Lancaster, Plaintiff's Husband**

Plaintiff's husband, Gregory Lancaster, also testified at the ALJ hearing. The ALJ asked about her activities in Michigan, prior to the move, and Mr. Lancaster testified that both she and he had "become ministers during that period" and were "somewhat active in the local church" to which they belonged. (AR 2143.) Prior to moving to Tennessee, they both did "teaching and some preaching in the church" in an "associate-type role," doing "whatever the Senior Pastor felt that [they] could handle." (*Id.*) This included "tak[ing] care of new Christians," doing "some training with them," and working with "a group of people as far as local evangelism in the area." (*Id.*) The church they attended had 200 to 250 members.

When asked how his wife was doing physically during the period when his father came to live with them until he died in May 1992, he responded as follows:

> Well, from a . . . physical standpoint she had been getting therapy for back problems that she had chronic and well, things weren't so great because of my, you know, mother dying and my son had almost died . . . . He had gotten real ill and he had just been out of the hospital for a short time during that period also but I, you know, I guess, with all of those things going on, we just kinda plodded along.

(AR 2137.) He also testified that Plaintiff "didn't do very well" with the move to Tennessee in November 1993 and "had a hard time adapting to the new environment." (AR 2138.) Mr. Lancaster had observed Plaintiff becoming very withdrawn and losing an "alarming" amount of weight after the move. (AR 2138.) He also described her as being very anxious and depressed, and recounted that she had told him at some point that she did not feel well and thought she was losing her mind. (AR 2139.) Asked how long "this level of anxiety and depression [had] been going on before" Plaintiff first saw Dr. Burns in November 1994, Mr. Lancaster stated: "It had gone on for, probably, the better part of a year. I believe it started . . . right after we moved. I'd say right after the first of the year and in '94, it got to be really, it started to get to

be really bad."  (AR 2139.)

    **E.**    **Plaintiff's Diaries**

Photocopies of Plaintiff's diaries dating from September 11, 1984 through September 28, 1995, and from January and February 2005 were submitted to the ALJ at the hearing.  (AR 237–614.)  The stated purpose of the diaries is a "search after 'God' " (AR 650), and the vast majority of the writing concerns Plaintiff's relationship with God and her church.  In addition, the diary entries document Plaintiff's post-partum depression during the summer of 1990, and indicate she was still having highs and lows but was generally feeling somewhat better by September 1990.  (AR 243–300; see AR 275, 9/3/1990 diary entry ("The depression still comes and goes.  It's a little better each day.").)  Between October 1990 and December 1990, Plaintiff continued to document emotional ups and downs but no longer appears to have been in the grip of a deep depression.  As of December 1990, Plaintiff began mentioning abdominal pain.  The entries for the first half of 1991 chronicle continued physical pain and discomfort, and frustration with the inability of the medical community to diagnose or treat the problem.  Even during this time frame, however, the bulk of the writing concerns Plaintiff's spiritual life.  The entries dating from July 1991 through August 1993 (AR 498–580) indicate that Plaintiff experienced a significant amount of sadness and grief in her personal life, as well as frustration and despair in her spiritual life, but they do not suggest that Plaintiff was ever suffering from depression that was debilitating to the point of rendering her disabled from working through August 1993.  Likewise, although Plaintiff's diary entries document continued problems with pain, at times described as intermittent and other times as chronic, nothing in Plaintiff's writings would substantiate a conclusion that she was disabled from working as a result of pain through August 1993.

Her diary entries contain a gap from early August 1993 until February 1994.  From February through May 1994, Plaintiff's entries are short and infrequent, and they document primarily her unhappiness regarding her and her family's move from Michigan to Tennessee.  In March 1994 she wrote that she was having trouble sleeping again.  (AR 581.)  In April 1994, she noted:  "I can't sleep and weight is falling off me."  (AR 582.)  As of May 25, 1994, even Plaintiff's handwriting changed dramatically, and she wrote that she had begun shaking uncontrollably and sweating and basically falling apart.  (AR 584–85.)  Her writing over the next few months reveals an increasingly desperate and depressed state of mind

(AR 584–93) up until she began treatment with Dr. Burns in November 1994, after which she continued to document severe depression but her handwriting is once again legible.  (AR 593–614.)

###### F.        Vocational Testimony at the Hearing

Vocational Expert ("VE") Kenneth Anchor also testified at the hearing, and described Plaintiff's past relevant work as consisting of sedentary skilled work as a secretary, and light, skilled work as a pre-school teacher.  (AR 2144–45.)  The VE testified that the limitations ascribed by Dr. Burns' assessment would "not appear to allow for full-time work."  (AR 2145.)  The ALJ posited a hypothetical situation involving a claimant who was limited to light work, needed a sit-stand option and could stand or walk for no more than six hours in an eight-hour workday, had very limited ability to push or pull in the lower extremities, and needed to avoid ladders, ropes, scaffolds and crawling, and could only occasionally climb stairs or ramps, or stoop, bend, kneel, crouch or crawl.  She also needed to avoid extremes in temperatures, dampness, wetness, humidity, vibrations, and unprotected heights.  The VE testified that with those limitations, the claimant could perform Plaintiff's past relevant work as a secretary.  He also testified that if the claimant were limited to sedentary work, she could still perform work as a secretary.

## II.        THE ALJ'S DECISION

In his written decision issued October 3, 2005, the ALJ referenced Plaintiff's extensive record, with particular emphasis on the medical records that predate November 1994, when Plaintiff began treatment with Dr. Burns.  The ALJ's opinion also reflects that he reviewed the diary entries submitted by Plaintiff at the hearing, which he considered to relate primarily to her "beliefs and failings related to them." (AR 16.)  He also noted that some of the complaints set out in the diary were corroborated by the medical records but the majority were not, and were therefore considered "subjective complaints."  (*Id.*)  Other factors the ALJ considered relevant to the Plaintiff's credibility were (1) the fact that she did not seek medical care for any of her alleged problems between July 1991 and November 1994; (2) her failure to seek specialized care from a mental health professional until late 1994; (3) her husband's testimony that Plaintiff was a practicing minister in Michigan and active in counseling church members prior to the move to Tennessee; and (4) the fact that from 1987 through June 1991, treating physician Dr. Ashwin Shah provided "routine conservative treatment for low back pain, pregnancy, and for primarily transient illnesses."  (AR 16.)  The ALJ noted that Dr. Shah had documented continued weight loss of unknown

etiology as of April 26, 1991, but that as of June 3, 1991, Plaintiff had gained three pounds.  (*Id.*)

The ALJ also took notice of the fact that, as reflected in Dr. Weiss's records, from whom Plaintiff sought an evaluation for low back and right hip pain radiating to her ankle, Plaintiff reported she had been in good health until March 1990, up until which time she had engaged in activities such as reading, playing piano, bowling and biking.  Dr. Weiss was unable to find a cause for Plaintiff's symptoms and recommended physical therapy.  Finally, the ALJ observed that Plaintiff reported to Dr. Burns in 1994 that her problems with depression and anxiety were triggered by the move to Tennessee.  (AR 17.)  As a result, the ALJ concluded:

> Although the claimant does have an underlying medically determinable impairment that could reasonably cause pain, the record does not contain objective signs and findings that could be reasonably expected to produce the limitations alleged by the claimant during the period of August 1, 1989 through September 30, 1993.

(AR 18.)

He determined that the weight of the evidence established that, during the relevant time frame, Plaintiff retained the residual functional capacity for a full range of light work but was limited in pushing/pulling in the lower extremities; no climbing of ladders, ropes, scaffolds; occasional climbing of stairs, ramps, balancing, stooping, kneeling and crouching.  She also needed to avoid extremes in temperature, dampness, wetness, humidity, vibrations, jars or jolts, hazardous machinery, and unprotected heights.  He found no severe mental limitations through September 1993.  (AR 18.)

After consideration of the record as a whole, the ALJ made the following specific findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits . . . and is insured for benefits through September 30, 1993.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability to September 30, 1993.

3.  The claimant's stress fractures with residuals, and radiculopathy of the lumbar spine are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1529(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant had the residual functional capacity to perform light work with the limitations described in the body of this decision.

7.  The claimant's past relevant work as a secretary, and pre-school teacher did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision [sic] (20 CFR § 404.1520(f)).[6]

(AR 18–19.)

## III.   APPLICABLE LEGAL STANDARDS

### A.    Standard of Review

This Court must affirm the Commissioner's conclusions absent a determination that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *see also Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994). Even if this Court were inclined to reach a contrary conclusion of fact, the Commissioner's decision must be affirmed so long as it is supported by substantial evidence. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). Accordingly, a district court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B.    The Social Security Act and Disability

The central issue on appeal is whether substantial evidence supports the ALJ's determination that Plaintiff was not disabled during the relevant time period. To be entitled to DIB, a claimant must be insured for disability at the time she becomes "disabled" within the meaning of Title II of the Social Security Act. 42 U.S.C. § 423. The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" *Id.* § 423(d)(1)(A). The Act further provides:

An individual shall be determined to be under a disability only if his physical or mental

_____

[6] Although the Opinion references no finding of disability "through the date of the decision," the Court observes that the ALJ's attention was focused on the time period up through the last insured date of September 30, 1993, and therefore concludes that the reference to the date of the decision, rather than to the last insured date, was an unintentional error.

impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

*Id.* § 423(d)(2)(A).

In making a determination as to disability under the above definition, an ALJ is required to follow a five-step sequential evaluation set out in the Social Security Administration's regulations. 20 C.F.R. § 404.1520. In *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997), the Sixth Circuit summarized the five-step analysis as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Id.* at 529 (citing 20 C.F.R. § 404.1520). Under the first four steps, the claimant has the burden of proof. *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 147–48 (6th Cir. 1990). At step five, however, the burden of proof shifts to the Commissioner. *Id.* at 148.

## IV.    LEGAL ANALYSIS

Plaintiff claims that the ALJ committed reversible error in the following respects:

(1) The ALJ violated 20 C.F.R. § 404.1527, SSR 96-22 and SSR 96-6p when he failed to consider or to explain why he did not ascribed controlling weight to the opinion of Dr. Burns, Plaintiff's treating psychiatrist, regarding the severity of her mental conditions;

(2) The ALJ violated SSR 83-20 when he failed to "call on the services of a medical advisor," which Plaintiff claims is required "when onset [of disability] must be inferred," even though Plaintiff specifically requested in writing that he do so;

(3) The ALJ failed at Step 2 of the Sequential Evaluation to find that Plaintiff's mental conditions, chronic abdominal pain and left leg edema and pain, either singly or in combination, constituted severe

impairments;

(4)  The ALJ violated 20 C.F.R. § 404.1545 when he failed to consider all of Plaintiff's impairments, including those considered "non-severe," in evaluating her residual functional capacity;

(5)  The ALJ violated applicable regulations and SSR 96-7p in evaluating Plaintiff's credibility with regard to her allegations of disabling pain and her subjective complaints generally;

(6)  The ALJ failed in his obligations to consider and properly evaluate all of the evidence in the record "taken as a whole"; and

(7)  The ALJ failed to consider or to provide a reason for finding no functional limitations resulting from Plaintiff's twenty-nine-pound weight loss.

Each of these arguments is addressed in turn, below.

**A.    The Failure to Accord Weight to Dr. Burns' Opinion**

Plaintiff asserts the ALJ violated 20 C.F.R. § 404.1527, Social Security Ruling ("SSR") 96-22 and SSR 96-6p when he failed to accord any weight to, or even to consider the uncontradicted opinion of Dr. Burns, Plaintiff's treating psychiatrist, regarding the severity of her mental conditions.  The problem with Plaintiff's position, of course, is that Dr. Burns did not begin treating Plaintiff until November 1994, more than a year after her DLI, September 30, 1993, and he never professed to offer an opinion that Plaintiff's mental condition was actually disabling prior to the DLI.

The Sixth Circuit has observed that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value."  *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir. 2004).  In fact, record medical evidence from after a claimant's date last insured is only relevant to a disability determination where the evidence "relates back" to the claimant's limitations prior to the date last insured.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988) (noting that evidence of a medical condition diagnosed after the date last insured was only "minimally probative" of claimant's condition during the insured period).  Moreover, evidence of a claimant's post-DLI condition, to the extent that it relates back, is relevant only if it is reflective of a claimant's *limitations* prior to the date last insured, rather than merely his impairments or condition prior to this date.  *See* 20 C.F.R. § 416.945(a)(1) ("Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is the most you can still do

despite your limitations."); *see also Higgs*, 880 F.2d at 863 ("The mere diagnosis . . . , of course, says nothing about the severity of the condition.").

Here, Dr. Burns' records and statements reflect his opinion that Plaintiff was disabled by her mental condition as of September 1994 and thereafter. Dr. Burns' opinion is therefore not relevant to the question of whether Plaintiff was actually disabled by her condition prior to her DLI. In fact, Dr. Burns' medical records tend to establish the contrary, as they corroborate other evidence in the record, including Plaintiff's diary entries and her husband's testimony at the hearing, that Plaintiff's mental condition declined sharply after she and her husband moved from Michigan to Tennessee in November 1993, almost two months after the expiration of her insured status.

Even if Dr. Burns' diagnosis of a disabling mental health condition related back to the relevant time period, which it does not, a retrospective diagnosis relating back to the insured period may be considered proof of disability only if it is corroborated by evidence contemporaneous with the eligible period. *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). Here, again, there is no corroborating evidence to establish that Plaintiff suffered from a *disabling* condition *prior to September 1993. See id.* (noting that a diagnosis of fibromyalgia with an onset date prior to the expiration of the insured period was not sufficient to prove disability, since fibromyalgia is not usually disabling).

Consequently, the ALJ did not err in failing to accord any weight to Dr. Burns' opinion and diagnosis, since they did not relate back to the relevant time period and therefore are completely irrelevant to a determination of disability prior to the DLI.

### C. The ALJ's Failure to Call on the Services of a Medical Advisor

Plaintiff next asserts that the ALJ violated SSR 83-20 when he failed to "call on the services of a medical advisor," which Plaintiff claims is required "when onset [of disability] must be inferred," even though Plaintiff specifically requested in writing that he do so. (Doc. No. 21, at 52.)

Social Security Ruling 83-20 pertains to onset of disability, but it applies "only when there has been a finding of disability and it is necessary to determine when the disability began." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997). Since there was no finding that the claimant was disabled prior to the DLI, no inquiry into the onset date was required. As the Sixth Circuit has held, "[t]he only necessary inquiry is whether the claimant was disabled prior to the expiration of [her] insured status." *Id.* Because

the Court agrees the ALJ properly concluded that Plaintiff was not disabled prior to September 30, 1993, no medical advisor was required to help ascertain the onset date of disability.

**D.    The ALJ's Purported Error in Failing to Consider Additional Conditions to Be "Severe Impairments" at Step Two of the Sequential Evaluation**

Plaintiff claims the ALJ committed reversible error when he failed to find, at Step Two of the Sequential Evaluation, that Plaintiff's depression, chronic abdominal pain and left leg edema and pain, either singly or in combination, constituted severe impairments.

This argument is unavailing.  In the Sixth Circuit, the severity determination is "a *de minimis* hurdle in the disability determination process."  *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).  "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience."  *Higgs*, 880 F.2d at 862. The purpose of the test is to "screen out totally groundless claims."  *Anthony*, 266 Fed. Appx. at 457 (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).

Regardless, Plaintiff's argument that the ALJ erred in failing to enumerate additional complaints among those he considered "severe" at step two is misguided.  The ALJ specifically found that Plaintiff's stress fractures with residuals and radiculopathy of the lumbar spine qualified as severe impairments. Plaintiff therefore cleared step two of the analysis.  After that point, the ALJ was required to consider Plaintiff's severe and non-severe impairments in the remaining steps of the sequential analysis.  The fact that some of Plaintiff's impairments were not deemed to be severe at step two is therefore legally irrelevant.  *Anthony*, 266 Fed. Appx. at 457 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (likewise holding that the failure to find that an impairment was severe was harmless error where other impairments were deemed severe)).  The ALJ, therefore, did not commit reversible err in this regard, even assuming Plaintiff is correct that other impairments she suffered should have been deemed "severe."

**E.    The Alleged Failure to Consider All Impairments, Including Non-severe Impairments, in Determining Plaintiff's Residual Functional Capacity**

Plaintiff claims the ALJ violated 20 C.F.R. § 404.1545 when he failed to consider all of Plaintiff's impairments, including those considered "non-severe," in evaluating her residual functional capacity

("RFC").

The cited regulation, which references the evaluation of a claimant's RFC, states in pertinent part:

If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe," ,. . . when we assess your residual functional capacity.

20 C.F.R. § 404.1545(a)(2). Plaintiff states in a conclusory fashion, without discussion or reference to any portion of the ALJ's decision, that "[t]he ALJ obviously did not consider the limiting effects of all of [Plaintiff's] impairments, even those he characterized as 'non-severe,' in determining her RFC." (Doc. No. 21, at 55.) Plaintiff's conclusion appears to be based on the fact that the ALJ did not find her to be disabled prior to the DLI; she seems to be implying that, if he had considered all her impairments, he "obviously" would not have reached that conclusion.

Contrary to Plaintiff's assertion and assumption, the Court finds that the ALJ appropriately considered all of Plaintiff's non-severe limitations in determining her RFC. With regard to her alleged depression, the ALJ noted that Dr. Dua's records reflect that Plaintiff's post-partum depression ameliorated beginning in September 1990, and there were many dates between September and December 1990 when Plaintiff "failed even to mention this impairment" to Dr. Dua. (AR 17.) In addition, Plaintiff did not seek treatment from a mental health specialist until late 1994. Because there was no evidence that Plaintiff was on any anti-depressant medication or, indeed, undergoing any medical treatment at all from 1991 until November 1994, the ALJ concluded that Plaintiff's post-partum depression had a minimal effect on her ability to work from August 1, 1989 (the alleged onset date) through the DLI, September 30, 1993. He therefore did not assign any mental limitations in evaluating Plaintiff's RFC during that time frame. His conclusion in that regard is supported by substantial evidence in the record.

Likewise with respect to her other "non-severe" impairments, including chronic abdominal pain and left leg edema and pain, there is no objective evidence in the record that these complaints had any long-term effect on Plaintiff's functioning during the insured period. She began complaining of abdominal pain in December 1990. She underwent an exploratory and diagnostic D&C in the spring of 1991, but the cause of her abdominal pain was never determined. She did not seek further treatment for the condition from June 3, 1991 through late 1994, so there is no objective medical evidence in the record to indicate that Plaintiff continued to suffer pain to such an extent that it would have had any effect on her ability to

work from that time through the expiration of her insured status. With respect to the left leg edema and pain, the record indicates Plaintiff suffered an injury and hospitalization in 1988, but there is no indication in the record that she continued to complain of problems relating to that condition after April 1989 up until she presented with swelling and blisters on her left food in September 1996. Plaintiff continued working until August 1989, so it is difficult to see how the condition could be considered to have impaired her ability to work, though the ALJ nonetheless noted that he considered the "residuals" related to her left foot fracture to constitute a severe impairment. Further, he apparently took that impairment into consideration in determining Plaintiff's RFC when he found her to be limited to standing and walking six hours out of an eight-hour workday, and to have a limited ability to push or pull with the lower extremities, among other restrictions. The fact that he did not take into consideration the swelling and pain in her left leg that recurred well after her DLI was not error because, again, there is no medical evidence relating those symptoms to the insured time period.

The ALJ appropriately considered Plaintiff's severe and non-severe impairments in determining her RFC.

### F. The Alleged Failure to Comply with Applicable Regulations, Rulings and Case Law in Evaluating Plaintiff's Subjective Complaints of Pain and her Credibility Generally

Plaintiff claims the ALJ violated 20 C.F.R. § 404.1529 and SSR 96-7p in evaluating Plaintiff's credibility with regard to her allegations of disabling pain and her subjective complaints generally. In her brief, Plaintiff quotes extensively from the referenced regulation and ruling but provides no analysis whatsoever as to how the ALJ failed to comply with them. (*See* Doc. No. 21, at 55–58.) She also quotes extensively from the Sixth Circuit's opinion in *Rogers v. Commissioner of Social Security*, 486 F.3d 234 (6th Cir. 2007) (*id.* at 58–60), and provides one statement of analysis: "The ALJ completely failed to follow the said authority in determining that Ms. Lancaster was not disabled." (*Id.* at 61.)

Upon review of the ALJ's decision, the Court finds that the decision adequately complies with the applicable law. As the Commissioner points out, the ALJ discussed in great detail Plaintiff's alleged mental condition, Dr. Burns' records, her post-partum depression diagnosis and treatment, Plaintiff's journal, her familial and religious issues, the swelling in her leg and her pelvic and back pain. (AR 15–17.) The problem Plaintiff faces, to reiterate, is that the vast majority of the medical records before the Commissioner (and this Court) fully support a conclusion that her emotional and physical problems did

not reach a disabling level of severity until mid-1994, at the earliest. Although Plaintiff's diaries document ongoing spiritual, physical and emotional turmoil, as previously stated, they do not indicate a disabling level of pain or depression. Plaintiff's testimony at the hearing likewise does not indicate that she suffered from long-term disabling pain or depression between 1989 and September 1993. Further, Plaintiff's subjective complaints in her diaries and at the hearing are not corroborated by any medical evidence between June 1991 and her DLI.

In sum, the Court finds that the ALJ properly assessed Plaintiff's credibility and the other evidence in the record and that his determination that Plaintiff did not suffer from a disability for DIB purposes prior to the DLI is supported by substantial evidence in the record.

### G. The Alleged Failure to Consider Evidence in the Record "As a Whole"

Plaintiff also argues that the ALJ "did not meaningfully take into account the evidence in Ms. Lancaster's favor, but to the contrary the ALJ either ignored, misstated and/or misconstrued the great wealth of evidence supporting her claims, and focused exclusively on anything that could possibly be characterized . . . as supporting a denial of benefits." (Doc. No. 21, at 61.) Plaintiff asserts this constitutes reversible error. Presumably in support of this argument, but in a wholly different section outside the "argument" portion of her brief, Plaintiff claims that the ALJ "repeatedly misrepresents the facts to support his denial of benefits." (*Id.* at 43.) The purportedly misrepresented facts include:

(1) The ALJ misquoted Plaintiff's husband's testimony as indicating they were both "very active in the ministry" while they were in Michigan, when he actually stated they were "somewhat active." This error is *de minimis* and did not result in reversible error given the other evidence in the record that substantiates the ALJ's decision.

(2) The ALJ stated that while some of Plaintiff's complaints in her diary from the insured period were "corroborated by the medical records, the majority are considered subjective complaints." (Doc. No. 21, at 44 (quoting AR 16).) Plaintiff argues that the ALJ's assertion "simply misframes the issue at hand." (*Id.* at 45.) The Court agrees that the statement employs some shorthand but construes the statement to refer to the fact that subjective allegations of pain must be corroborated by objective medical evidence, of which there was none after June 1991.

(3) The ALJ noted that as of April 1991, Plaintiff was not taking any medications. As a factual

statement, this is correct, but Plaintiff takes issue with the fact that the statement does not reflect the fact that Plaintiff could not tolerate any of the pain medication prescribed to her. The ALJ did, however, take note of that fact in a different portion of his opinion. (*See* AR 16 (noting Plaintiff had reported to Dr. Weiss that she had "sensitivity and reaction to many drugs").) Plaintiff's bald assertion that her own testimony and her diary entries "overwhelmingly 'indicate' that she took prescribed medication (but without success) during the time frame from late 1991 to 1994" (Doc. No. 21, at 45) is simply not substantiated by the record.

(4) Plaintiff takes issue with the ALJ's characterization of Dr. Shah's treatment records as establishing that the "claimant received routine conservative treatment for low back pain, pregnancy, and for primarily transient illness." (Doc. No. 21, at 46 (quoting AR 16).) Plaintiff asserts that neither the left-leg swelling nor the chronic pelvic pain were "transient illnesses." (*Id.*) However, the left leg swelling did not appear to be a problem after April 1989, as previously noted, until it recurred in 1996. Plaintiff received no treatment for pelvic pain from Dr. Shah after June 1990. Although Plaintiff may be correct that the condition was not "transient," the record is clear that Plaintiff stopped seeking treatment related to it until well after her DLI, and there is no contemporaneous evidence in the record regarding the degree to which the condition affected her ability to work.

(5) Plaintiff characterizes as "cherry picking" the ALJ's characterization of physical therapist Mark Mijnsbergen's assessment of Plaintiff as having experienced "significant progress in her posture and reduction of pain." (Doc. No. 21, at 46 (quoting AR 16–17).) While the Plaintiff is correct that Mijnsbergen also documented continued back pain and the fact that they decided to discontinue physical therapy pending resolution of the abdominal pain, Mijnsbergen did in fact note a significant degree of improvement. Plaintiff also accuses the ALJ of "cherry picking" when he noted that Dr. Dua documented improvement in Plaintiff's post-partum depression after September 1990. In fact, the record does seem to indicate that Plaintiff's post-partum depression remitted significantly with treatment; Plaintiff herself reported as much to Dr. Burns. The fact that Plaintiff continued to complain of occasional bouts of despair thereafter does nothing to refute that evidence.

(6) Plaintiff objects to the ALJ's erroneous reference to an Exhibit 32 as indicating Plaintiff reported daily activities of reading, playing the piano, bowling and biking during the insured time period.

In fact, there is no Exhibit 32, but the Court presumes the ALJ intended to refer to April 1991 letter from Dr. Weiss to Dr. Rotter (contained in Dr. Shah's medical records, Exhibit 29), documenting Plaintiff's description of her leisure interests as including "reading and playing the piano, and sports such as bowling and biking." (AR 1982.) Plaintiff asserts that the evidence "overwhelmingly establishes that by 09/30/1993" Plaintiff was not engaging in those activities. To the contrary, Plaintiff's diary entries for 1992 and 1993 indicate that, despite the physical pain that came and went (*see, e.g.*, AR 523–24, 1/2/1992 diary entry ("I've been dealing with that [pain] again now for about a week.")), her life continued on track.

In sum, the problem with Plaintiff's position and her quibbles with the ALJ's characterization of the evidence in the record is, of course, that the relevant question is whether substantial evidence in the record supports the ALJ's decision, not whether substantial evidence would also have supported a finding of disability. As set forth above, the Court finds that the ALJ properly considered the relevant evidence— that is, the evidence that related to the Plaintiff's insured period—and that his decision is supported by substantial evidence.

### H. The Failure to Consider Plaintiff's Twenty-Nine-Pound Weight Loss

Finally, Plaintiff claims the ALJ erred when he failed to consider or to provide a reason for finding no functional limitations resulting from Plaintiff's twenty-nine-pound weight loss. Plaintiff's argument in this regard borders on the frivolous. The record indicates that Plaintiff normally weighed between 117 and 120 prior to her pregnancy. After her pregnancy, the first mention of Plaintiff's weight appears in Dr. Dua's treatment note for December 11, 1990, when the physician noted Plaintiff's weight to be 104 and that Plaintiff complained she was unable to gain weight. (AR 754.) Neither Plaintiff nor Dr. Dua appeared alarmed about Plaintiff's weight at that time, nor is there any evidence that Plaintiff's weight at that time affected her ability to work. Over the next several months, while Plaintiff was complaining of abdominal pain, her weight fluctuated by no more than a few pounds and was still at 104 pounds six months later, on June 3, 1991. (AR 1994.) There is no evidence in the record that Plaintiff continued to lose weight from that date through her DLI. The next notation anywhere regarding Plaintiff's weight is from Plaintiff's own diary entry for April 22, 1994, in which she states, "weight is falling off me." (AR 582.) At the hearing, she testified that believed her weight went down to ninety-one pounds by approximately August of 1994. Her diary documents that she was down to ninety-one pounds as of October 11, 1994. (AR 589–90.)

The fact that Plaintiff was losing weight in 1994 is, again, irrelevant to a determination of whether she was disabled prior to September 30, 1993. Because there is not one scintilla of evidence in the record that Plaintiff's weight loss resulted in an impairment of any kind prior to her DLI, the ALJ did not err in failing to take into consideration her drastic weight loss nearly two years after the expiration of her insured status.

**V.    CONCLUSION**

As set forth above, the Court finds that the Commissioner applied the appropriate legal standards and that his factual determinations are supported by substantial evidence in the record. The referral to the Magistrate Judge will be withdrawn and an appropriate order denying Plaintiff's Motion for Judgment on the Record and affirming the Commissioner's decision will be entered.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge